# United States Court of Appeals
## For the Eighth Circuit

_____

No. 10-3197

_____

Shirley L. Phelps-Roper; Megan Phelps-Roper

*Plaintiffs - Appellees*

v.

City of Manchester, Missouri

*Defendant - Appellant*

------------------------------

United States of America

*Amicus on Behalf of Appellant*

Christina Wells

*Amicus on Behalf of Appellee*

State of Missouri

*Amicus on Behalf of Appellant*

Thomas Jefferson Center for the Protection of Free Expression

*Amicus on Behalf of Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 9, 2012
Filed: October 16, 2012

_____

Before RILEY, Chief Judge, WOLLMAN, LOKEN, MURPHY, BYE, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, En Banc.

_____

MURPHY, Circuit Judge.

Shirley and Megan Phelps-Roper brought this First Amendment facial challenge to an ordinance adopted by the city of Manchester to regulate the time and place of picketing at funerals and burials. Relying in part on Phelps-Roper v. Nixon, 545 F.3d 685 (8th Cir. 2008), cert. denied, 129 S. Ct. 2865 (2009), the district court ruled that each version of the Manchester ordinance violated the First Amendment, enjoined its enforcement, and awarded nominal damages. After a panel of this court affirmed, we granted Manchester's petition for rehearing en banc and vacated the panel opinion. Now concluding that the final version of the city's ordinance is a legitimate time, place, and manner regulation consistent with the First Amendment, we reverse, vacate the district court's injunction, and remand for entry of judgment in favor of Manchester.

I.

Shirley and Megan Phelps-Roper are members of the Westboro Baptist Church who assert that God punishes America by deaths of its citizens for tolerating homosexuality. The Phelps-Ropers picket at funerals and other public places to express their beliefs. Affidavits submitted by them in this case state they "use an available public platform to publicize [their] religious message." They have been seen displaying signs at funerals of fallen soldiers with messages such as "God Hates Fags," "Thank God for Dead Soldiers," and "Thank God for 9/11." See Phelps-Roper

v. Strickland, 539 F.3d 356, 359 (6th Cir. 2008); see also Snyder v. Phelps, 131 S. Ct. 1207, 1213 (2011).

Manchester, a city in St. Louis County, Missouri with approximately 19,000 residents, adopted an ordinance in 2007 designed to limit the time and place of picketing and "other protest activities" around funerals or burials. Manchester, Mo., Code § 210.264. It has been amended twice, and its first sentence declares that "[e]very citizen may freely speak, write and publish the person's sentiments on all subjects, being responsible for the abuse of the right . . . ." The full text is included in the appendix at the end of this opinion. In its briefing Manchester states that the "driving force behind [the] ordinance is the need to protect the dignity that is inherent in funerals in our society, a dignity which inures to the physical and psychological benefit of the family of the deceased."

Manchester's amended ordinance sets certain time and place restrictions in connection with funerals and burials. Picketing and "other protest activities" are barred within 300 feet of any funeral or burial site during or within one hour before or one hour after the conducting of a funeral or burial service at that place. Manchester defines "other protest activities" as "any action that is disruptive or undertaken to disrupt or disturb a funeral or burial service." As amended, the ordinance does not restrict picketing or protesting funeral processions. A violation of the ordinance can result in a fine of no more than $1,000 and/or up to three months imprisonment. Manchester, Mo., Code § 100.100(A). Under Manchester's code three violations can result in a mandatory fine of at least $500 and imprisonment of at least five days. Id.

The constitutionality of the state of Missouri's funeral protest statute was considered by a panel of our court in Nixon, 545 F.3d at 688. On her appeal from the denial of a preliminary injunction, the panel concluded that Shirley Phelps-Roper could likely show that the statute violated the First Amendment. Id. at 694. Relying on Frisby v. Schultz, 487 U.S. 474, 484 (1988), and Olmer v. City of Lincoln, 192

F.3d 1176, 1182 (8th Cir. 1999), the Nixon panel concluded that the government interest in protecting individuals from unwanted speech would not extend beyond the home. Nixon, 545 F.3d at 692. It also decided that Missouri's statute likely was not narrowly tailored nor did it likewise provide "ample alternative channels" for communication, citing Kirkeby v. Furness, 92 F.3d 655, 662 (8th Cir. 1996). Nixon, 545 F.3d at 693–94. Because Missouri's statute appeared to be an impermissible time, place, and manner restriction in violation of the First Amendment, the panel reversed the denial of injunctive relief. Id. at 692–94.

Megan and Shirley Phelps-Roper filed this action against the city of Manchester in 2009. Relying on Nixon, they assert that the First Amendment protects their right to display their messages at the time and place of their choosing. Although the Phelps-Ropers have never gone to Manchester to picket at a funeral or burial, they seek a permanent injunction preventing enforcement of the ordinance as well as nominal damages. Shirley Phelps-Roper also sued seven other Missouri municipalities with funeral protest ordinances; each of those cases was dismissed after the ordinances were repealed. Manchester chose to amend its ordinance.

The district court granted summary judgment to the Phelps-Ropers. It concluded that they had standing to challenge the city's current ordinance and that their opposition to its earlier versions was not moot. The court decided that the ordinance is content based and therefore presumptively invalid, but would also be unconstitutional if subject to intermediate scrutiny. Citing Nixon, the district court concluded the ordinance was constitutionally flawed because it was not narrowly tailored to advance a significant governmental interest or to allow for ample alternative channels for communication. Each version of the ordinance was held unconstitutional under the First and Fourteenth Amendments, and the amended version was permanently enjoined. The Phelps-Ropers were also awarded nominal damages. Manchester appealed.

A panel of this court affirmed. Phelps-Roper v. City of Manchester, 658 F.3d 813, 817 (8th Cir. 2011). It held that the district court erred by concluding that the

-4-

Manchester ordinance is a content based regulation because it does not favor some topics or viewpoints over others. The panel agreed however that an injunction was required under Nixon, which had adopted Olmer's conclusion that the government has no significant interest in protecting unwilling listeners outside the residential context. The Phelps-Roper challenges to the earlier versions of the ordinance were held to be moot.

Manchester petitioned for rehearing en banc, arguing that its interest in protecting the peace and privacy of persons making final farewells to loved ones at a funeral or burial outweighed the Phelps-Ropers' asserted right to picket whenever and wherever they choose. It submits that the Supreme Court indicated in Snyder, 131 S. Ct. at 1218, that a government may impose reasonable time, place, and manner restrictions on funeral protests and that it has done exactly that. We granted its petition for rehearing en banc and vacated the prior panel opinion pending our decision here.

Manchester contends that its ordinance does not offend the First Amendment because it protects the rights of funeral attendees to mourn in peace and privacy for a limited time and in a limited space. It points out that the ordinance is not directed at the content of a protestor's speech or at the manner of its delivery. Its restrictions are narrow, for anyone may speak in the city at all other times and places. Picketers are not barred from the vicinity of funerals or burials; funeral attendees could likely see or hear picketers or protesters from 300 feet. Moreover, the amended ordinance no longer restricts funeral processions and now comes completely within a decision of the Sixth Circuit Court of Appeals upholding Ohio's funeral protest statute. See Strickland, 539 F.3d at 373. Only the immediate site of a funeral or burial is affected by the ordinance, and its restrictions are limited to the actual ceremony and to one hour before and after it.

On their facial challenge the Phelps-Ropers argue that Manchester's ordinance impermissibly suppresses their right to picket, engage in other protest activities, and express their religious beliefs close to a funeral or burial service at the time of their

choosing. They assert that the First Amendment issues in this case were correctly decided in Nixon. According to Shirley Phelps-Roper, church members abandoned plans to picket at two funerals in or about Manchester because of the ordinance and have not considered picketing there since.

The lack of any actual picketing by the Phelps-Ropers in Manchester limits the record before the court. They have not shown when or where in the city they might want to make their messages visible to funeral attendees or what their signs would say. "Facial challenges are disfavored" because they "often rest on speculation. . . . [and] raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" Wash. State Grange v. Wash. State Republican Party et al., 552 U.S. 442, 450 (2008) (citing Sabri v. United States, 541 U.S. 600, 609 (2004)). To succeed challengers would have to establish "'that no set of circumstances exists under which [the ordinance] would be valid,'" United States v. Stevens, 130 S. Ct. 1577, 1587 (2010) (citing United States v. Salerno, 481 U.S. 739, 745 (1987)), or "that the statute lacks any 'plainly legitimate sweep.'" Id. (citation omitted). An ordinance may also be invalidated on a facial First Amendment challenge as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." Id. (citation omitted). First Amendment issues require a "case-by-case analysis of the fact[s]," and they are missing in this facial challenge of Manchester's ordinance. Broadrick et al. v. Okla. et al., 413 U.S. 601, 615–16 (1973).

We need not speculate here as to any "[p]articular hypothetical applications of the ordinance," Frisby, 487 U.S. at 488, for the issues before the court require a focus on the content of Manchester's amended ordinance and the question of whether the city has enacted a constitutional regulation restricting picketing and other protest activities for the purpose of protecting the peace and privacy of mourners attending a funeral or burial service in the city. Such activities must occur at least 300 feet from that location during the ceremony and for one hour before and after it.

-6-

II.

A.

The First Amendment provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." It has long been made applicable to the states, Gitlow v. New York, 268 U.S. 652, 666 (1925), and its protections are at the core of our democratic society. They include the ability to petition the government, to follow one's own religious beliefs, and to associate with others. See Boy Scouts of Am. v. Dale, 530 U.S. 640, 647 (2000); Wallace v. Jaffree, 472 U.S. 38, 48–49 (1985). Picketing is expressive conduct "within the protection of the First Amendment," Police Dep't of Chicago v. Mosley, 408 U.S. 92, 99 (1972), and our nation has a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).

Although citizens have a "right to attempt to persuade others to change their views" which "may not be curtailed simply because the speaker's message may be offensive to his audience," Hill v. Colorado, 530 U.S. 703, 716 (2000), that right is not absolute. The government may restrict disruptive and unwelcome speech to protect unwilling listeners when there are other important interests at stake. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 208–09 (1975), and cases cited there. Where there are competing interests and values, courts must find an "acceptable balance between the constitutionally protected rights of law-abiding speakers and the interests of unwilling listeners." Hill, 530 U.S. at 714; see Kovacs v. Cooper, 336 U.S. 77, 88 (1949).

The constitutionality of an ordinance regulating the exercise of protected speech in a public forum depends in large part on whether it is content based, R.A.V. v. City of St. Paul, 505 U.S. 377, 383–84 (1992), or content neutral, Frisby, 487 U.S.

at 481. Content based regulations, such as those which "impose special prohibitions on those speakers who express views on disfavored subjects," R.A.V., 505 U.S. at 391, are "presumptively invalid," id. at 382, are subject to the most exacting scrutiny, and must be narrowly tailored to serve a compelling government interest. Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 642–53 (1994). Content neutral time, place, or manner regulations by contrast are tested by intermediate scrutiny. Id. at 642. They must be "narrowly tailored to serve a significant governmental interest" and allow for "ample alternative channels for communication." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (citation omitted).

B.

Manchester objects that the Phelps-Ropers lack standing to challenge the final form of its ordinance and that their objections to the earlier versions are moot. We review justiciability questions de novo. St. Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481, 484 (8th Cir. 2006). To establish standing, plaintiffs "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). There must be "a realistic danger of sustaining a direct injury as a result of [a law's] operation or enforcement." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). Mootness is akin to the doctrine of standing because the "requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." McCarthy v. Ozark Sch. Dist., 359 F.3d 1029, 1035 (8th Cir. 2004) (citations omitted). When a law has been amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot unless the problems are "capable of repetition yet evad[ing] review." Id. at 1036 (citation omitted).

The district court concluded that the Phelps-Ropers had standing to challenge the current ordinance since it was "aimed . . . directly" at members of their church, "prohibits exactly the funeral picketing in which plaintiffs regularly engage," and Manchester had not "disavowed any intent to enforce" it. The court also decided that

the challenges to the two earlier versions of the ordinance were not moot because Manchester could reenact them at a future date. The Phelps-Ropers argue in addition that their requests for nominal damages will prevent any mootness determination in this case.

The district court did not err in concluding that the chill alleged by the Phelps-Ropers from the current version of the ordinance is objectively reasonable in that they are "not without some reason in fearing prosecution" under it. Babbitt, 442 U.S. at 302. Manchester's ordinance addresses their preferred manner of protest. The Phelps-Ropers may have an objective fear of prosecution since the city has not disavowed its intention to enforce it. See St. Paul Area Chamber of Commerce, 439 F.3d at 487. While they have never tested Manchester's ordinance, they claim they have made unidentified "changes to their operations" because of it. See id. (citation omitted).

The Phelps-Roper challenges to the two earlier versions of the ordinance are moot. The record does not support a reasonable expectation that Manchester will reenact the earlier versions because the current ordinance was purposefully amended to correspond with the Sixth Circuit's considered judgment in this emerging area of constitutional law. See Strickland, 539 F.3d at 373. The Phelps-Ropers have shown that they likely are capable of challenging any further change to the present ordinance. They have filed at least seven other lawsuits against Missouri municipalities with funeral protest laws. Their request for nominal damages does not give them standing to challenge the first two versions of the ordinance because they cannot revive an otherwise moot claim against "a regime no longer in existence." Morrison v. Bd. of Educ., 521 F.3d 602, 611 (6th Cir. 2008). We conclude that the only justiciable question before the court is whether Manchester's current ordinance is a constitutionally permissible regulation of speech.

C.

Whether exacting or intermediate scrutiny should be applied to review Manchester's amended ordinance depends on whether it is a content based or content

-9-

neutral regulation. See Turner, 512 U.S. at 642. The district court speculated that the ordinance would permit "an abortion protest within 300 feet . . . that is loud enough to disturb a funeral but is not undertaken with that goal in mind" and is therefore content based. Manchester responds that its ordinance is content neutral because it applies to all picketing or other protest activities disruptive of funerals or burials regardless of the content of the message conveyed. The Phelps-Ropers contend that the ordinance is content based because their protests prompted its passage and because its description of "other protest activities" indicates it would not be enforced unless speech was undertaken with the intent to "disrupt or disturb a funeral or burial service."

The Supreme Court has addressed the question of whether a statute is content neutral many times. In Hill, 530 U.S. at 707, for example, the Court examined a Colorado statute which prohibited certain contacts within 100 feet of the entrance to any health care facility. It prohibited nonconsensual approaches within 8 feet of another person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . ." Id. (citation omitted). The statute was content neutral because it did not regulate speech, but rather "the places where some speech may occur." Id. at 719. Its "restrictions appl[ied] equally to all demonstrators, regardless of viewpoint, and the statutory language ma[de] no reference to the content of the speech." Id. (citation omitted). Moreover, "the State's interests in protecting access and privacy, and providing the police with clear guidelines, [were] unrelated to the content of the demonstrators' speech." Id. at 719–20.

The Sixth Circuit relied on Hill to conclude in Strickland that identical language to that in Manchester's amended ordinance was content neutral. 539 F.3d at 361. The Ohio statute was content neutral because it was only "a regulation of the places where some speech may occur," it "was not adopted because of disagreement with the message [the speech] conveys," and its asserted purpose was "unrelated to the content of [a funeral protestor's] speech." Id. (citing Hill, 530 U.S. at 719–20). That is also true of Manchester's amended ordinance. The Nixon panel decided that the state of Missouri's funeral protest statute was similarly content neutral even

-10-

though it targeted "funeral picketing and was enacted for the purpose of silencing [Shirley Phelps-Roper's] speech in particular." 545 F.3d at 691. As the panel emphasized there, the "plain meaning of the text controls, and the legislature's specific motivation for passing a law is not relevant, so long as the provision is neutral on its face." Id.

The district court's reliance on Carey v. Brown, 447 U.S. 455, 461–62 (1980), and R.A.V., 505 U.S. at 391, for its conclusion that the ordinance is content based was misplaced. The statute in Carey, 447 U.S. at 461–62, was content based because it excluded speech on labor issues from its ban on residential picketing. The ordinance in R.A.V., 505 U.S. at 386, was similarly content based because it proscribed certain fighting words while allowing other types of speech. Manchester's ordinance is different from those cases because it prohibits picketing and other protest activities without limitation as to its content. It is like the ordinance in Thorburn v. Austin, 231 F.3d 1114, 1117 (8th Cir. 2000), which was content neutral since it applied "equally to anyone engaged in focused picketing without regard to his message." See also Police Dep't of Chicago, 408 U.S. at 98–99.

Manchester's ordinance provides that every citizen "may freely speak, write and publish the person's sentiments on all subjects." (emphasis supplied). The Phelps-Ropers nevertheless suggest that it is content based because a court might have to look at the subject matter of protestors' speech to determine whether it was "undertaken to disrupt or disturb a funeral or burial service." As the Supreme Court has pointed out, however, some review of the content of speech may be necessary to determine if a speaker is actually engaged in "protest" as opposed to "pure social or random conversation." Hill, 530 U.S. at 721. Such a "cursory examination" does not transform an otherwise content neutral statute into a content based regulation. Id. at 722.

We conclude that Manchester's ordinance is content neutral. A person may be regulated under the ordinance for disrupting or attempting to disrupt a funeral or burial service with speech concerning any topic or viewpoint. The ordinance makes "no reference to the content of the speech" and is only a "regulation of the places

where some speech may occur." Hill, 530 U.S. at 719–20. It simply limits when and where picketing and other protest activities may occur in relation to a funeral or burial service without regard for the speaker's viewpoint. We agree that the "asserted purpose for the [ordinance], the protection of . . . citizens from disruption during . . . a funeral or burial service," Strickland, 539 F.3d at 361, is unrelated to the content of the regulated speech.

For these reasons we conclude that Manchester's ordinance is content neutral and that intermediate scrutiny is the appropriate standard for examination of the First Amendment issues raised here. See Turner, 512 U.S. at 642.

III.

The Phelps-Ropers contend that even if Manchester's ordinance is content neutral, it cannot survive intermediate scrutiny because it is not "narrowly tailored to serve a significant governmental interest" and does not allow for "ample alternative channels for communication." Ward, 491 U.S. at 791 (citation omitted). Citing Nixon, 545 F.3d at 692, the district court concluded that Manchester's ordinance was unconstitutional because the city could not show a significant interest in protecting funeral attendees from unwanted communication, the 300 foot buffer zone was "simply too large to be narrowly tailored," and the ordinance "places too great a restriction on public speech." Manchester argues that the district court erred, that its ordinance is closely modeled on the law upheld in Strickland, and that the intervening Supreme Court decision in Snyder requires reexamination of Nixon.

A.

In Snyder v. Phelps, 131 S. Ct. 1207, 1213 (2011), the Supreme Court addressed whether the father of a deceased soldier could bring tort claims against the Phelps-Ropers' church for protesting near his son's funeral with signs containing messages such as "Thank God for Dead Soldiers," "God Hates Fags," "You're Going to Hell," and "God Hates You." While the church and its members were shielded from tort liability, the Court observed that the picketers had "addressed matters of

-12-

public import on public property, in a peaceful manner, in full compliance with the guidance of local officials." Id. at 1220.

The speech could not "be restricted simply because [its message] is upsetting or arouses contempt." Id. at 1219. The church members were entitled to "special protection" under the First Amendment because the protest occurred "at a public place on a matter of public concern." Id. If there is "a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Id. (citing Texas v. Johnson, 491 U.S. 397, 414 (1989)). The Court also pointed out that church members had "fully complied with police guidance" in connection with the funeral and had stood "some 1,000 feet" away from the targeted audience. Id. at 1218. The church members had "stayed well away from the memorial service," the family of the decedent could see "no more than the tops of the signs when driving to the funeral," and "there [was] no indication that the picketing in any way interfered with the funeral service itself." Id. at 1220.

The issues presented in Snyder were more concrete than here, for the Phelps-Ropers have not picketed in Manchester or tested the enforcement of its ordinance. The facts were also quite different in Snyder, for there the church members protested approximately 1,000 feet from the funeral site and no burial or funeral protest regulation was in effect. Id. at 1213, 1218. Here, by contrast, Manchester's amended ordinance only limits picketing and other protest activities within 300 feet of a funeral or burial service while it is occurring and for one hour before and after. The Supreme Court stated that its holding in Snyder was "narrow." Id. at 1220. The Court acknowledged that the church's "choice of where and when to conduct its picketing is not beyond the Government's regulatory reach—it is 'subject to reasonable time, place, or manner restrictions' . . . ." Id. at 1218 (citation omitted). A challenge to a funeral protest law such as in the case before our court would thus raise "very different questions from the tort verdict at issue" in Snyder. Id.

Recently Congress enacted a new military funeral law providing a time, place, and manner restriction similar to Manchester's ordinance. Honoring America's

-13-

Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. 112-154, 126 Stat. 1165 § 601 (Aug. 6, 2012) (to be codified at 18 U.S.C. § 1388). That federal statute limits demonstrations near funerals of members or former members of the armed forces. Id. It is meant to "provide necessary and proper support for the . . . Armed Forces . . . by protecting the dignity of [their] service" and "the privacy of their immediate family members and other attendees during funeral services for such members." Id. Its restrictions prohibit a person within 300 feet of a funeral of a member or former member of the armed forces from "willfully making or assisting in the making of any noise or diversion . . . that disturbs or tends to disturb the peace or good order . . ." for two hours before and after the funeral. Id. It provides for criminal and civil penalties. Id. Its passage by unanimous vote indicates a congressional consensus surrounding the communal importance of funerals and the need to protect mourners at such a particularly vulnerable time in their lives.

B.


The question remains whether Manchester's ordinance is a legitimate and limited time, place, and manner restriction consistent with Snyder and other Supreme Court cases. Since Manchester's ordinance is a content neutral regulation, we begin by asking whether there exists a significant government interest in protecting the privacy of funeral attendees. See Ward, 491 U.S. at 791.

Nixon suggested that there was no such interest underlying the Missouri statute because the state's interest in protecting citizens from unwanted speech does not extend beyond the home. 545 F.3d at 691–92. In reaching that conclusion the panel cited Frisby, 487 U.S. 474, and relied on Olmer, 192 F.3d at 1182. The Supreme Court concluded in Frisby that there is a significant government interest in completely banning picketing "before or about" a residence to protect "the well-being, tranquility, and privacy of the home." 487 U.S. at 476, 484 (citations and quotations omitted). Since there "simply is no right to force speech into the home of an unwilling listener," the government could protect the privacy of a captive homeowner. Id. at 485. Subsequent to Frisby, however, the Supreme Court had decided Madsen v. Women's Health Center, Inc., 512 U.S. 753 (1994), a significant First Amendment

-14-

decision which the <u>Olmer</u> court failed to consider. <u>Olmer</u> had relied on <u>Frisby</u> to conclude that "the home is different" and that "[a]llowing other locations, even churches, to claim the same level of constitutionally protected privacy would . . . permit government to prohibit too much speech and other communication." 192 F.3d at 1182.

In <u>Madsen</u>, 512 U.S. at 767–68, the Court had expanded the protected area beyond the home. There, the Court considered First Amendment challenges to an injunction prohibiting certain picketing and noise near clinic entrances and the homes of abortion providers. <u>Id.</u> at 759–61. Reasoning that the "[s]tate's strong interest in residential privacy . . . applied by analogy to medical privacy," the Court concluded in <u>Madsen</u> that the interests "in protecting a woman's freedom to seek lawful medical . . . services" and "ensuring the public safety and order" were "quite sufficient to justify an appropriately tailored injunction." <u>Id.</u> at 767–68. By relying on <u>Olmer</u> without considering <u>Madsen</u>, <u>Nixon</u>'s analysis of the significant government interest factor was incomplete.

<u>Nixon</u> also did not reflect the Supreme Court's discussion of the significant government interest in <u>Hill</u>, 530 U.S. at 715–18, which protected the privacy of patients entering medical facilities. The statute under consideration in <u>Hill</u> protected an area within 100 feet of the entrance to any health care facility from nonconsensual approaches within 8 feet of another "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . ." <u>Id.</u> at 707. The Court upheld it under the First Amendment because the statute served the "significant and legitimate" interest of providing "unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." <u>Id.</u> at 725, 715. Since those entering a health care facility "are often in particularly vulnerable physical and emotional conditions," they might suffer "physical and emotional harm . . . when an unwelcome individual delivers a message (whatever its content) by physically approaching . . . at close range." <u>Id.</u> at 729, 718 n.25. While acknowledging that the "right to avoid unwelcome speech has special force in the privacy of the home . . . and

-15-

its immediate surroundings," id. at 717 (citing Frisby, 487 U.S. at 485), the Court decided that it "can also be protected in confrontational settings." Id.

In considering Manchester's ordinance, the district court relied in part on Nixon's conclusion that the government could not show a significant interest in protecting the privacy of individuals outside the home. That reasoning does not withstand scrutiny, however, given the developments in Supreme Court jurisprudence subsequent to Frisby. While the government's interest in protecting an individual's privacy may have "special force" in the context of an individual residence, Hill, 530 U.S. at 717, it is not limited to such settings. The government can show such an interest "in confrontational settings," id., and in certain instances when the "offensive speech . . . is so intrusive that the unwilling audience cannot avoid it." Id. at 716 (citing Frisby, 487 U.S. at 487). We therefore overrule the rulings in Nixon and Olmer which limited the government's interest in protecting unwilling listeners to residential settings. See Cottier v. City of Martin, 604 F.3d 553, 556 (8th Cir. 2010) (en banc) ("When sitting en banc, the court has authority to overrule a prior panel opinion, whether in the same case or in a different case.").

We conclude that mourners attending a funeral or burial share a privacy interest analogous to those which the Supreme Court has recognized for individuals in their homes, Frisby, 487 U.S. at 484–85, and for patients entering a medical facility, Hill, 530 U.S. at 717; Madsen, 512 U.S. at 767–68. Mourners have a similarly "significant and legitimate" interest in avoiding "potential trauma" when attending a funeral or burial. Hill, 530 U.S. at 725, 715. A government can restrict residential picketing without offending the First Amendment because it leaves homeowners "with no ready means of avoiding the unwanted speech." Frisby, 487 U.S. at 487. Mourners are similarly situated because they must also be in a certain place at a certain time to participate in a funeral or burial and are therefore unable to avoid unwelcome speech at that place and time. A significant governmental interest exists in protecting their privacy because mourners are in a vulnerable emotional condition and in need of "unimpeded access" to a funeral or burial, quite like the patients entering medical facilities protected in Hill, 530 U.S. at 715, 729.

-16-

The social and cultural significance of funerals and burial rites was recognized by the Supreme Court in National Archives & Records Administration v. Favish, 541 U.S. 157, 167–68 (2004). As the Court explained in Favish,

> [f]amily members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own.

Id. at 168. By preventing the release of photographs of the deceased under the Freedom of Information Act, the government was protecting the "privacy of the living" in Favish and preventing "a violation of their own rights in the character and memory of the deceased." Id. at 168–69 (citation omitted). Manchester's ordinance similarly reflects a common interest which outweighs any absolute right to picket at funerals and burials without any type of limitation.

Here, Manchester has shown that it has a significant interest in protecting the privacy of funeral attendees. Although the Court chose not to treat the plaintiff in Snyder as "a member of a captive audience at his son's funeral," 131 S. Ct. at 1219–20, in this facial challenge we do not look to one particular set of circumstances. We rather ask if there exist any set of plausible circumstances in which Manchester's ordinance may be constitutionally applied and whether the ordinance has a plainly legitimate sweep. The facts in Snyder differ considerably from those covered by this ordinance which does not restrict funeral processions, for example. It was the funeral procession in Snyder which came within 200 to 300 feet of the picketers. Id. at 1213.

Manchester's ordinance also advances a significant government interest because it solely focuses on the event of a funeral or burial ceremony. That fact is critical. If speech is distasteful to an individual, the "burden normally falls upon the viewer to 'avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" Erznoznik, 422 U.S. at 210–11 (citation omitted) (alternation in original). If offensive picketers are at a specific location, one can generally choose to avoid them.

-17-

Manchester's ordinance only covers the relatively short time around a funeral or burial, an event with a uniquely fixed time and location. During that window the mourners are "captive to their overwhelming human need to memorialize and grieve for their dead." Alan Brownstein & Vikram David Amar, <u>Death, Grief, and Freedom of Speech: Does the First Amendment Permit Protection Against the Harassment and Commandeering of Funeral Mourners?</u>, 2010 Cardozo L. Rev. De Novo 368, 374–75. It is unreasonable to expect a family or friend of the deceased to reschedule or forgo attending the funeral so as to avoid offensive picketing.

In upholding a funeral statute essentially identical to Manchester's ordinance, the Sixth Circuit also concluded that there is a significant government interest in protecting the privacy of funeral attendees. <u>Strickland</u>, 539 F.3d at 366. As the court reasoned there, funerals "implicate the most basic and universal human expression 'of the respect a society shows for the deceased and for the surviving family members.'" <u>Id.</u> (quoting <u>Favish</u>, 541 U.S. at 168). We agree that "[f]riends and family of the deceased should not be expected to opt-out from attending their loved one's funeral or burial service" to avoid unwelcome and unwanted speech. <u>Id.</u> at 366.

We conclude that Manchester has shown a significant government interest in protecting the peace and privacy of funeral attendees for a short time and in a limited space so that they may express the "respect they seek to accord to the deceased person who was once their own." <u>Favish</u>, 541 U.S. at 168.

C.

The Phelps-Ropers also assert that Manchester's ordinance is not narrowly tailored and does not permit ample alternative channels for their means of communication. Although a valid time, place, or manner regulation "need not be the least restrictive or least intrusive" means of serving the government's interest, it may not restrict "substantially more speech than is necessary." <u>Ward</u>, 491 U.S. at 798–99. Whether an ordinance is narrowly tailored or not depends on what it seeks to regulate. <u>See</u> <u>id.</u>

Manchester's ordinance limits picketing and "other protest activities" which are defined as "any action that is disruptive or undertaken to disrupt or disturb a funeral or burial service." That same language in the Ohio statute was examined in Strickland, where the Sixth Circuit commented on its limited nature. 539 F.3d at 367–68. It interpreted this language as restricting "picketing or other protest activities that are directed at a funeral or burial service." Id. at 368 (emphasis supplied). The court compared the statutory language using the singular form of a "funeral or burial service" to similar wording in Frisby, which had used the "singular form to designate the place from which picketing was proscribed" (a particular residence). Id. (citing Frisby, 487 U.S. at 482). We agree that Manchester's ordinance is fairly construed not to apply to picketing or other protest activities which may unwittingly occur within the 300 foot buffer zone during the time restrictions in the ordinance.

We conclude that Manchester's amended ordinance is narrowly tailored because it places very few limitations on picketers and the city's significant interest in protecting the privacy of funeral attendees justifies the 300 foot restriction for a specific limited time and a short duration. The Supreme Court judged a 500 foot restriction on congregating outside foreign embassies to be narrowly tailored to protect security interests, Boos v. Barry, 485 U.S. 312, 329–32 (1988), as well as a 100 foot zone around health care facilities to protect patients from interference with their privacy, Hill, 530 U.S. at 726, and the area "before or about" a home to protect residential privacy. Frisby, 487 U.S. at 485–88. Manchester's amended ordinance eliminated any restrictions on processions. It was narrowed to eliminate restrictions on any such floating zones, and it now only places limitations within 300 feet of a funeral or burial. Picketers can still reasonably communicate their message to funeral attendees and others. Other than the narrow time and place restrictions in the ordinance, no limit is placed "on the number of speakers or the noise level, including the use of amplification equipment" or "on the number, size, text, or images of placards." Strickland, 539 F.3d at 371.

To be sure, in Kirkeby, 92 F.3d at 660–61, we stated that an ordinance banning targeted picketing within 200 feet of the homes of abortion providers would likely

restrict "more speech than necessary." That conclusion was based in large part on Madsen, 512 U.S. at 774–75, where the Supreme Court had found a 300 foot residential buffer zone unconstitutional, but the buffer zones examined in Kirkeby and Madsen had no limits on duration. Manchester's ordinance, by contrast, only limits picketing at the time of a funeral or burial service and for one hour before and after. The "size of a buffer zone necessary to protect the privacy of an entire funeral gathering can be expected to be larger than that necessary to protect the privacy of a single residence [like in Kirkeby and Madsen]." Strickland, 539 F.3d at 371.

Manchester's ordinance is also distinct from most buffer zone cases in that it protects events, not locations. See Brownstein & Amar, 2010 Cardozo L. Rev. De Novo at 374–75; cf. Hill, 530 U.S. at 707 n.1; Madsen, 512 U.S. at 759. A law barring picketing within 300 feet of a clinic closes an area of the city from protest activities without limitation in time. By contrast, Manchester's ordinance only restricts protests for a relatively short period, tailored to encompass a mourner's time of highest emotional vulnerability and no longer. Protesters are free to picket throughout the area for most of the day. Where the restriction on speech is relatively brief in time, it is not unreasonable to increase the range of a buffer zone without significantly burdening protesters's opportunity to convey their message. See Strickland, 539 F.3d at 371.

The narrow tailoring of Manchester's ordinance becomes even clearer upon examination of the closely related question of whether it leaves open "ample alternative channels" for speakers to disseminate their message. Manchester does not restrict individuals from publicizing their views. Like the protesters in Frisby, individuals "may go door-to-door to proselytize their views," "may distribute literature . . . through the mails," and "may contact residents by telephone." 487 U.S. at 483–84 (citation omitted). Dissemination of a message by letters to the editor or the internet is also possible. A picketer's speech is not restricted in its content and may be freely expressed anywhere in the city except during a short period immediately surrounding a funeral service. Otherwise individuals may picket in Manchester wherever and whenever they desire. Speakers retain great latitude to express any viewpoint or

discuss any topic at nearly any location and nearly any time in the city of Manchester. For these reasons, Manchester's ordinance does not restrict "substantially more speech than is necessary." Ward, 491 U.S. at 799.

We conclude that Manchester's ordinance is narrowly tailored and leaves open ample alternative channels for communication. The ordinance does not limit speakers or picketers in any manner apart from a short time and narrow space buffer zone around a funeral or burial service.

IV.

The rights of speakers to express their views publicly and disseminate their religious beliefs are protected by the First Amendment. The Supreme Court has also recognized the rights of mourners not to be "intrud[ed] upon [during] their . . . grief," Favish, 541 U.S. at 168, as well as the rights of persons in "vulnerable physical and emotional conditions." Hill, 530 U.S. at 729. Given the competing interests identified in this case, the court is called upon to consider an "acceptable balance between the constitutionally protected rights of law-abiding speakers and the interests of unwilling listeners." Id. at 714.

We conclude that the Phelps-Ropers have not shown in their facial challenge to Manchester's amended ordinance that the city has imposed unconstitutional limits on the time, place, and manner of their picketing. Manchester only limits picketing and other protest activities within 300 feet of a funeral or burial service while it is occurring and for one hour before and after, and it survives First Amendment scrutiny because it serves a significant government interest, it is narrowly tailored, and it leaves open ample alternative channels for communication.

Having concluded that the Phelps-Ropers have not shown that Manchester's amended ordinance violates the Constitution, we reverse the decision of the district court, vacate its injunction as well as its award of nominal damages, and remand for entry of judgment in favor of the city of Manchester.

-21-

# APPENDIX

Manchester Code § 210.264, as amended on October 19, 2009:

Funeral Protests Prohibited, When – Citation of Law – Definition

A. Every citizen may freely speak, write and publish the person's sentiments on all subjects, being responsible for the abuse of the right, but no person shall picket or engage in other protest activities, nor shall any association or corporation cause picketing or other protest activities to occur within three hundred (300) feet of any residence, cemetery, funeral home, church, synagogue, or other establishment during or within one (1) hour before or one (1) hour after the conducting of any actual funeral or burial service at that place.

B. As used in this Section, "other protest activities" means any action that is disruptive or undertaken to disrupt or disturb a funeral or burial service.

C. As used in this Section, "funeral" and "burial service" mean the ceremonies and memorial services held in conjunction with the burial or cremation of the dead, but this Section does not apply to processions while they are in transit beyond any three hundred (300) foot zone that is established under Subsection (A) above.

SMITH, Circuit Judge, concurring.

I concur in the majority's holdings that (1) the Phelps-Ropers have standing to challenge the current ordinance, *supra* Part II.B.; (2) "[t]he Phelps-Roper challenges to the two earlier versions of the ordinance are moot," *supra* Part II.B.; (3) "Manchester's ordinance is content neutral," *supra* Part Part II.C.; and (4) "intermediate scrutiny is the appropriate standard for examination of the First Amendment issues raised here," *supra* Part II.C. I also concur in the court's holding that Manchester's ordinance is a constitutionally valid time, place, and manner regulation. *Supra* Part III. I write separately to express concern about the extension of the unique protection afforded the sanctuary of the home to funerals and burials. Manchester states a "significant" interest, but the question is close and the grade on this slope should not be seen as having been greased.

"A content-neutral time, place and manner regulation may be imposed in a public forum if it: (1) serves a significant government interest; (2) is narrowly tailored; and (3) leaves open ample alternative channels of communication." *Nixon*, 545 F.3d at 691 (citing *Ward*, 491 U.S. at 791; *Veneklase v. City of Fargo*, 248 F.3d 738, 744 (8th Cir.2001) (en banc)).

In its opening brief, Manchester asserts a "significant interest in protecting its citizens from the *psychological* harm that results from outside interference in the grieving process." (Emphasis added.) It later states that "[t]he death of a loved one places great strains on the bereaved, affecting their emotions, often their finances, and even their *physical* health." (Emphasis added.) In its reply brief, Manchester contends that "[t]he driving force behind [its] ordinance is the need to protect the dignity that is inherent in funerals in our society, a dignity which inures to the physical *and* psychological benefit of the family of the deceased." (Emphasis added.)

In *Madsen*, the Supreme Court found a "combination of . . . governmental interests" that justified the injunction prohibiting certain picketing and noise near

abortion clinics. 512 U.S. at 768. These interests included "a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy"; "a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens"; and a "strong interest in residential privacy, acknowledged in *Frisby* . . . , applied by analogy to medical privacy." *Id*. at 767–68. The Supreme Court indicated that it was a combination of both potential psychological *and* physical harm that defined the significant government interest. *See id*. at 768. Specifically, the Court agreed that "while targeted picketing of the home threatens the psychological well-being of the 'captive' resident, targeted picketing of a hospital or clinic threatens not only the psychological, *but also the physical*, well-being of the patient held 'captive' by medical circumstance." *Id*. (emphasis added).

And, the *Hill* Court, in clarifying that it was not determining "whether there is a 'right' to avoid unwelcome expression," explained that

> [t]he purpose of the Colorado statute *is not to protect a potential listener from hearing a particular message*. It is to protect those who seek medical treatment from the *potential physical and emotional harm* suffered when an unwelcome individual delivers a message (whatever its content) by *physically approaching* an individual at *close range*, *i.e.*, within eight feet. In *offering protection from that harm*, while maintaining free access to health clinics, the State pursues interests constitutionally distinct from the freedom from unpopular speech to which Justice KENNEDY refers.

530 U.S. at 718 n.25 (emphases added). Thus, *Hill* clarifies that the valid governmental purpose in *Hill* was not "protect[ing] a potential listener from hearing a particular message"; instead, the valid governmental purpose was in the *joint interests* of protecting persons "from the potential physical *and* emotional harm suffered when an unwelcome individual delivers a message . . . by *physically approaching* an individual at *close range*." *Id*. (emphasis added).

-24-

Because Manchester asserts the *joint interests* of protecting funeral attendees from psychological *and* physical harm, as in *Madsen* and *Hill*, I concur in the court's conclusion that Manchester has a significant government interest in enacting the ordinance. *See supra* Part III.B.

But make no mistake, this court is extending the circumference of what this circuit has previously found constitutes a significant government interest. The uniqueness of the funeral assembly justifies it. We must be concerned, however, that few, if any, other places become walled off to the free expression of ideas due to their potential effect on the hearer. Nevertheless, given the special and unique place an individual's funeral and burial hold in the lives of those touched by the deceased, the expansion is likely warranted. It is a journey taken only once. However, if government is enabled to restrict otherwise lawful speech for its *emotional offensiveness alone*, divorced from any potential physical harm, its ability to do so may not end with the case of understandably sympathetic mourners disturbed by zealous proclamations of disfavored groups. To keep the footing on this precedential slope sure, a significant government interest must not be diminished any more than these facts permit.

_____