# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3036

_____

Survivors Network of Those Abused by Priests, Inc.; David Biersmith; Holly
Hesemann; Call to Action, Inc.

*Plaintiffs - Appellants*

v.

Jennifer M. Joyce, solely in her official capacity as the Circuit Attorney for the
City of St. Louis, Missouri; Chris Koster, solely in his official capacity as the
Attorney General for the State of Missouri; Ronald K. Replogle, solely in his
official capacity as Superintendent of the Missouri Highway Patrol; Samuel
Dotson, III, solely in his official capacity as Chief of the St. Louis Metropolitan Police

*Defendants - Appellees*

------------------------------

Thomas More Society; Thomas Jefferson Center for the Protection of Free Expression

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 8, 2014
Filed: March 9, 2015

_____

Before WOLLMAN, LOKEN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

This action was brought by two Missouri non profit organizations and two individuals who regularly gather outside Catholic churches to address sexual abuse by priests and other matters of public concern. Four parties, appellants here, have raised a facial First Amendment freedom of speech challenge to Missouri's "House of Worship Protection Act." The Act prohibits intentionally disturbing a "house of worship by using profane discourse, rude or indecent behavior . . . either within the house of worship or so near it as to disturb the order and solemnity of the worship services." The district court upheld the Act and granted summary judgment to the defendants; the plaintiffs appeal. We reverse.

I.

In 2012 the Missouri legislature enacted the House of Worship Protection Act, Mo. Rev. Stat. § 574.035[1] (the Worship Protection Act). As relevant to this case, the Act provides that a person commits the crime of disrupting a house of worship if he or she "[i]ntentionally and unreasonably disturbs, interrupts, or disquiets any house of worship by using profane discourse, rude or indecent behavior, or making noise either within the house of worship or so near it as to disturb the order and solemnity of the worship services." Id. at § 574.035(3)(1). First and second violations of the Act are misdemeanors; third or more violations are felonies. Id. at § 574.035(4). "House of worship" is defined to mean "any church, synagogue, mosque, other building or structure, or public or private place used for religious worship, religious instruction, or other religious purpose." Id. at § 574.035(2). The defendant city and

---

[1]The full text of the Act appears in the appendix.

state officials,[2] appellees here, assert that the interest which led to the Act is protection of "those engaging in the free exercise of religion on private property." They have not presented evidence of actual disturbances to Missouri houses of worship, however.

Appellant Survivors Network of Those Abused by Priests (SNAP) is a non profit organization which advocates for victims of sexual abuse by clergy; one of its members is plaintiff Holly Hesemann. SNAP seeks to prevent future sexual abuse and to facilitate healing for its victims. For these purposes its members gather outside churches, administrative church buildings, and related venues to hold signs and pictures of abuse victims, to pass out pamphlets, and to speak with church personnel, visitors, and parishioners. SNAP members urge Catholics and church employees to share any information they have about sex abuse and to encourage victims of abuse to come forward with their experiences to begin healing. SNAP members regularly communicate their messages outside of a Catholic friary in St. Louis where a priest accused of child molestation resides. The friary is located within a mile of four elementary schools and five daycare centers, and among other messages members seek to inform those who live nearby of the accusations.

Plaintiff/appellant Call to Action, Inc. is a non profit organization which advocates for various changes in the Catholic Church, including the ordination of women, acceptance of gay, lesbian, and transgender people, and women's participation as altar servers. Members of Call to Action meet near a number of churches in Missouri to say prayers, hold signs, and distribute literature in an attempt to communicate their messages to church personnel and parishioners. In August

---

[2]Jennifer M. Joyce, Circuit Attorney for the City of St. Louis, Samuel Dotson, III, the Chief of the St. Louis Police Department, Chris Koster, the Missouri Attorney General, and Ronald K. Replogle, the Superintendent of the Missouri Highway Patrol.

2012, some of them demonstrated with church approval on the steps of the Cathedral Basilica of St. Louis in support of the Leadership Conference of Women Religious.

Plaintiff/appellant David Biersmith collaborates with SNAP and is a member of Voice of the Faithful-Kansas City, another organization created to protest against sexual abuse within the Catholic Church. Biersmith's two sons were abused and raped by a Catholic priest starting when they were 12 and 9 years old. Biersmith regularly pickets the Cathedral of the Immaculate Conception in Kansas City, Missouri, holding a sign which reads "'Boys will be boys,' Bishop Finn." The sign refers to a comment Bishop Robert Finn of the Catholic Diocese of Kansas City-St. Joseph reportedly made in response to news about abusive priests. Biersmith also pickets outside the Catholic Center in Kansas City-St. Joseph, which includes the chancery offices for the diocese and is used for religious purposes. He intends to inform others of his experience so they can protect their own children.

As stated in a joint stipulation of facts prepared by the parties in the district court, the plaintiffs believe that to reach their intended audience of church leaders and workers they need to picket the places where these individuals gather and work. Plaintiffs also believe they need to picket churches at times parishioners are present to hear their message. Following the passage of the Worship Protection Act, Biersmith has continued to picket at the Cathedral in Kansas City. On four or five occasions, its ushers have told him they have been offended by his message. One time an usher told Biersmith to "move on" and threatened "jail in 20 minutes" if he remained outside. Although the plaintiffs have stated that their expression has been chilled by the Act, no plaintiff has been arrested by the Missouri officials responsible for enforcing the statute. The summary judgment record also contains no evidence that plaintiff protesters have interfered in any way with churchgoers' entry or exit from a house of worship.

Plaintiffs brought this action in the United States District Court for the Eastern District of Missouri in August 2012, arguing that their First and Fourteenth Amendment rights were violated by portions of the Act. They challenged its prohibition of intentional and unreasonable disturbance of a house of worship "by using profane discourse, rude or indecent behavior." They do not challenge the proscription on "making noise." Plaintiffs assert that the Worship Protection Act chills their expression and interferes with their ability to speak in public locations where their intended audience may be reached—that audience being church officials and parishioners. They also claim violation of their right to due process because the statute is void for vagueness and does not provide fair notice of what activity is unlawful. Both sides moved for summary judgment. The district court granted the defendants' motion, and plaintiffs appeal.

II.

A.

The First Amendment protects freedom of expression and provides that Congress "shall make no law . . . abridging the freedom of speech." This amendment is also applicable to the states and state actors. See Gitlow v. New York, 268 U.S. 652, 666 (1925). We review the district court's grant of summary judgment de novo. ACLU Neb. Found. v. City of Plattsmouth, Neb., 419 F.3d 772, 775 (8th Cir. 2005) (en banc). The parties have not identified any factual disputes at issue in this appeal.

It is well established that our country has a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). The Supreme Court has explained that the right to free speech "includes the right to attempt to persuade others to change their views" which "may not be curtailed simply because the speaker's message may be offensive to his audience." Hill v. Colorado, 530 U.S. 703,

716 (2000). The Court has consistently recognized "the central importance of protecting speech on public issues." Boos v. Barry, 485 U.S. 312, 318 (1988).

There is no question that the speech appellants seek to protect extends to matters of pressing public concern since they raise issues of sexual abuse, accountability for these offenses, and healing for abuse victims. See Snyder v. Phelps, 131 S. Ct. 1207, 1217 (2011) (listing issues including "scandals involving the Catholic clergy" as "matters of public import."). Moreover, the Act regulates not only intentional disruptions that occur within a house of worship, but also those "so near" as to disturb a service. Mo. Rev. Stat. § 574.035(3)(1). That area reaches beyond the building itself into adjacent sidewalks and public spaces. The latter are "traditional public fora" which "occupy a special position in terms of First Amendment protection," and the government's ability to regulate speech in such places "is very limited." Boos, 485 U.S. at 318 (internal quotation marks omitted).

The constitutionality of a restriction on speech depends in large part upon whether it is content based and thus "subject to the most exacting scrutiny," Phelps-Roper v. City of Manchester, Mo., 697 F.3d 678, 686 (8th Cir. 2012) (en banc), or a content neutral time, place, or manner regulation subject to intermediate scrutiny. Id. The Supreme Court considers a number of factors to determine whether a regulation of speech is content based, one being whether "it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." McCullen v. Coakley, 134 S. Ct. 2518, 2531 (2014) (internal quotation marks omitted).

The Worship Protection Act does not ban all kinds of speech which might intentionally and unreasonably disturb a worship service. Rather, it bans the disruption of a house of worship "by using profane discourse, rude or indecent behavior." Mo. Rev. Stat. § 574.035(3)(1). The meaning of these adjectives is not defined in the Act. The state and local officials argue that the statute is a reasonable

time, place, and manner restriction directed at all speech which intentionally and unreasonably disrupts a house of worship. They assert that the characteristics of being profane, rude, or indecent serve only as guides to authorities who determine whether a speaker's purpose is to disrupt a service. This claim is unpersuasive.

The Act's text is plain in its ban on disturbing a house of worship "by using profane discourse, rude or indecent behavior" so near "as to disturb the order and solemnity of the worship services." Mo. Rev. Stat. § 574.035(3)(1) (emphasis added). The Act does not address any other potential means of disruption. In order to violate the Act a speaker must therefore use profane language or exhibit rude or indecent behavior close enough to disturb a worship service. "Profane," as it relates to speech or conduct, is defined as "irreverent to something held sacred." Black's Law Dictionary 1403 (10th ed. 2014). The Shorter Oxford English Dictionary defines "rude" as "[i]ll-mannered, impolite; offensive or discourteous, esp. intentionally." Shorter Oxford English Dictionary (6th ed. 2007). "Indecent" is defined as "[o]ffending against recognized standards of decency, esp. in relation to sexual matters; immodest; suggesting or tending to obscenity." Id.

The Act's prohibition on profane discourse and rude or indecent behavior is content based. This conclusion is analogous to that reached by the Supreme Court in Cohen v. California. 403 U.S. 15 (1971). In Cohen, the Court held unconstitutional a California law which prohibited "'maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person'" by "'offensive conduct.'" Id. at 16, 26 (alteration in original). The conduct at issue in Cohen was wearing a jacket displaying the phrase "Fuck the Draft." Id. at 16. The Court held that the prosecution of Cohen for the phrase on his jacket violated the First Amendment. Id. at 26. Acknowledging that the First Amendment permits speech which will often appear to many to be nothing more than "verbal tumult, discord, and even offensive utterance," the Supreme Court ruled that the right of free speech ensures open debate. Id. at 24–25. As the Court explained, it refused to "indulge the

facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." Id. at 26. Governments might otherwise "seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." Id.

In the case before our court the Worship Protection Act bans "profane" language and "rude or indecent behavior" without defining these adjectives or what is meant by "unreasonably" disrupting a house of worship. Mo. Rev. Stat. § 574.035(3)(1). The Supreme Court made clear in Texas v. Johnson that audience disapproval or general concern about disturbance of the peace does not justify regulation of expression. 491 U.S. 397, 407–08 (1989). A criminal conviction for violating a statute banning desecration of the flag was therefore inconsistent with the First Amendment. Id. at 420. That was because free speech may "'best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" Id. at 408–09 (quoting Terminiello v. Chicago, 337 U.S. 1, 4 (1949)). Disagreement with a message does not permit its suppression, for "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Id. at 414.

Analysis of such leading First Amendment cases indicates that the Worship Protection Act is a content based restriction on speech. The Act bans the use of "profane discourse, rude or indecent behavior," meaning that a protester holding a sign considered profane or indecent outside a church is subject to penalties because of the content of her speech. Enforcement authorities must decide not only whether the speaker intentionally and unreasonably disturbs a house of worship, but also whether she uses profane or rude expression in doing so. Such distinctions based on the nature of the message conveyed make the Act content based. See Cohen, 403 U.S. at 18. Disagreement with a message, even a profane or rude message, does not permit its suppression. See Johnson, 491 U.S. at 414.

B.

The Supreme Court pointed out in its recent decision in McCullen v. Coakley, 134 S. Ct. 2518 (2014), that a statute "would not be content neutral if it were concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech.'" Id. at 2531–32 (alteration in original), quoting Boos, 485 U.S. at 321. In Boos, a District of Columbia provision banned display of any sign within 500 feet of a foreign embassy which tended to bring the foreign government into "public odium" or "disrepute." 485 U.S. at 315 (internal quotation marks omitted). The Court decided that the District's law was content based and unconstitutional, for its ban on sign displays sought to regulate "speech due to its potential primary impact"—that is, the effect "that speech has on its listeners." Id. at 321, 329. Because the law sought "to protect the dignity of foreign diplomatic personnel by shielding them from speech that is critical of their governments," it was content based. Id. at 321.

The Worship Protection Act's ban on profane discourse and rude or indecent behavior in public places "so near [a house of worship] as to disturb the order and solemnity of the worship services," Mo. Rev. Stat. § 574.035(3)(1), is designed to protect worshipers or church personnel from the "potential primary impact" of certain speech on them. See Boos, 485 U.S. at 321. The Act seeks to regulate protesters standing on a public sidewalk either outside of, or across the street from, a house of worship if their speech "disturbs, interrupts, or disquiets," those who enter or exit the building or who may view such signs visible through a window. Mo. Rev. Stat. § 574.035(3)(1). The broad definition of "house of worship" also means the Act could be applied to a speaker or sign which could be heard or read in the vicinity of any worship service, whether held in a church or even a public park.

As amici point out, critical portrayals of Muhammad outside a mosque or of the Pope outside a Catholic Church might well be considered profane or indecent by their audiences. Others may find language using the name of holy figures as swear words not only disrespectful, but profane as well. Similar expressions in the near vicinity of a house of worship have the potential to disturb or disquiet those present for worship. The meaning of "profane," or irreverence to the sacred, is not a well defined legislative term familiar to people of different faiths. Any silent demonstration outside a house of worship would likely be able to create a disturbance only by the content of its message. Even expression that may be perceived as offensive, rude, or disruptive remains protected by the First Amendment. See Cohen, 403 U.S. at 24–25.

Some of the messages which appellants seek to communicate may well be considered rude and offensive by their target audience. The very topics which the record indicates appellants wish to address, including sexual abuse and the concealment of such crimes, can elicit strong emotional responses whether from clergy accused of wrongdoing, victims of abuse and their supporters, or church members. Others may take exception to the demonstrations by Call to Action advocating for the ordination of women and church acceptance of gay, lesbian, and transgender people.

The broad sweep of the Worship Protection Act's ban on profane discourse, rude, or indecent behavior can prevent significant messages from being publicly expressed, solely because they are offensive or disagreeable to some. Such risks are heightened near the places regulated by the Act—churches and buildings used for religious purposes. These locations are the most likely places for appellants to find their intended audience, including individuals who have personally been affected or victimized by instances of clerical sexual abuse and church employees with knowledge or information about abusive acts.

C.

In arguing that the Act is content neutral, appellees cite our en banc ruling in Phelps-Roper v. City of Manchester. 697 F.3d 678 (8th Cir. 2012). In that unanimous decision we upheld an ordinance which limited the time and place of picketing and protest activities designed to coincide with funerals and burials. Id. at 695. The "protest activities" regulated by the Manchester ordinance were defined as "any action that is disruptive or undertaken to disrupt or disturb a funeral or burial service." Id. at 683 (internal quotation marks omitted). We concluded that the ordinance was content neutral since "[a] person may be regulated under the ordinance for disrupting or attempting to disrupt a funeral or burial service with speech concerning any topic or viewpoint." Id. at 689. The ordinance made no reference to the content of any speech unlike the Missouri statute now before our court.

In stark contrast to the Manchester ordinance, the Worship Protection Act seeks to regulate "profane discourse, rude or indecent behavior." Mo. Rev. Stat. § 574.035(3)(1). The Act is targeted at not just the disruption of a worship service, but at the expressive content of the protest message. The Act is not a mere content neutral time, place, and manner regulation. See Boos, 485 U.S. at 320–21. The consequences of the Act's suppression of speech are of special concern since the area around a house of worship is the ideal location for appellants to find and speak directly to church members and concerned public, the target audiences for their messages. The threat of arrest for the content of a protester's message was not present in the Manchester ordinance unlike in this Missouri statute, under which one plaintiff has been threatened with "jail in 20 minutes" if he continued voicing his message near the Kansas City Cathedral. Of particular significance in this case is the joint stipulation of facts agreed to by all the parties and which specifies that the "[p]laintiffs have been chilled from engaging in expressive activity because of § 574.035."

-11-

Appellees' reliance on Hill v. Colorado, 530 U.S. 703 (2000), is misplaced. In Hill, the Supreme Court upheld a statute which prohibited a person within 100 feet of an entrance to a healthcare facility from knowingly approaching within 8 feet of another person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . ." Id. at 707 (internal quotation marks omitted). This was a content neutral time, place, and manner regulation because the statute regulated only "the places where some speech may occur." Id. at 719. (internal quotation marks omitted). In contrast, the Missouri statute now before our court seeks to regulate the content of speech. The Supreme Court recognized the possibility that future "cases may arise in which it is necessary to review the content of the statements made . . . to determine whether the approach [to a person was] covered by the statute." Id. at 721. While the Court has upheld content neutral bans on "picketing" and "demonstrating," id. at 722 n.30, the determination of whether particular speech occurring outside a house of worship is "profane" or "rude," Mo. Rev. Stat. § 574.035(3)(1), requires a complicated inquiry, not a mere "cursory examination," see Hill, 530 U.S. at 722.

D.

To determine whether the Act can survive strict scrutiny, we examine whether the statute is "narrowly tailored to serve compelling state interests." R.A.V. v. City of St. Paul, 505 U.S. 377, 395 (1992). The sole justification appellees have offered for the constitutionality of the Act is that it protects the free exercise of religion, citing Olmer v. City of Lincoln, 192 F.3d 1176 (8th Cir. 1999), overruled in part, Manchester, 697 F.3d at 692. In Olmer, we concluded that a regulation which restricted certain "focused picketing" of churches violated the First Amendment. Id. at 1178. In dicta we observed that "in the abstract" the governmental interest in preserving citizens' free exercise rights "is undoubtedly substantial and important," id. at 1180; appellees claim that the Worship Protection Act is necessary to protect that interest. No doubt religion plays an important role in the lives of many

-12-

Americans as Justice O'Connor pointed out in <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 35 (2004) (O'Connor, J., concurring in the judgment) (commenting that the United States is "a Nation founded by religious refugees and dedicated to religious freedom"). Even if the government interest in protecting the free exercise of religion were viewed as compelling, however, the content based prohibitions the Act places on profane or rude speech are not necessary to protect that freedom.

The Worship Protection Act seeks not only to protect houses of worship from disruption, but also to limit the content of certain messages. The existence of content neutral alternatives to protect houses of worship from disruption, such as noise regulations, "'undercut[s] significantly'" the defenses raised to the statutory content. <u>R.A.V.</u>, 505 U.S. at 395 (quoting <u>Boos</u>, 485 U.S. at 329) (alteration in original). The fact that § 574.035(3)(1) may employ means that are not necessary to achieve its purpose casts "considerable doubt on the government's protestations that 'the asserted justification is in fact an accurate description of the purpose and effect of the law.'" <u>Id.</u> (quoting <u>Burson v. Freeman</u>, 504 U.S. 191, 213 (1992) (Kennedy, J., concurring)). It is also significant that there is nothing in this record showing that any worship services have been disrupted in Missouri. Appellees have presented no evidence that any First Amendment activity outside houses of worship has caused anyone to be unable to pray or participate in worship services.

The statute at issue here, § 574.035(3)(1), is not necessary to protect access to any Missouri house of worship since a different section of the Act criminalizes obstructing the entrance to a house of worship. <u>See</u> Mo. Rev. Stat. § 574.035(3)(2) (criminalizing intentionally injuring, intimidating, or interfering with people "seeking access to a house of worship, whether by force, threat, or physical obstruction."). The content based regulations at issue in this case are therefore significantly distinguishable from the content neutral regulations in <u>Manchester</u> and <u>Hill</u>. <u>See</u> <u>Manchester</u>, 697 F.3d at 692 ("mourners are . . . in need of 'unimpeded access' to a

-13-

funeral or burial.") (quoting <u>Hill</u>, 530 U.S. at 715); <u>Hill</u>, 530 U.S. at 729 ("Persons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions."). Appellees make no allegation here that appellants have physically obstructed the entry or exit of any house of worship nor actually disrupted any particular service.

## III.

The Worship Protection Act draws content based distinctions on the type of expression permitted near a house of worship, forbidding profane discourse and rude or indecent behavior which would disturb the order and solemnity of worship services. Mo. Rev. Stat. § 574.035(3)(1). The Act's regulation of profane and rude speech runs "a substantial risk of suppressing ideas in the process." <u>Cohen</u>, 403 U.S. at 26. It impermissibly requires enforcement authorities to look to the content of the speaker's message in order to enforce the statute. <u>See</u> <u>Neighborhood Enter., Inc.</u>, 644 F.3d at 737. The ban on "profane" speech, for example, also appears intended to protect audiences from the effect that the content of certain messages may have on them. <u>See</u> <u>Boos</u>, 485 U.S. at 321. The First Amendment guarantees that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." <u>Johnson</u>, 491 U.S. at 414. This Missouri statute cannot survive strict scrutiny since § 574.035(3)(1) draws content based distinctions that are not necessary to achieve the state's asserted interest in protecting the free exercise of religion.

Since the Missouri House of Worship Protection Act violates the First Amendment, we reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

_____

-14-

<u>Appendix</u>

Missouri Revised Statutes § 574.035. House of worship protection act--disrupting a house of worship, violation, penalty.

1. This section shall be known and may be cited as the "House of Worship Protection Act".

2. For purposes of this section, "house of worship" means any church, synagogue, mosque, other building or structure, or public or private place used for religious worship, religious instruction, or other religious purpose.

3. A person commits the crime of disrupting a house of worship if such person:

(1) Intentionally and unreasonably disturbs, interrupts, or disquiets any house of worship by using profane discourse, rude or indecent behavior, or making noise either within the house of worship or so near it as to disturb the order and solemnity of the worship services; or

(2) Intentionally injures, intimidates, or interferes with or attempts to injure, intimidate, or interfere with any person lawfully exercising the right of religious freedom in or outside of a house of worship or seeking access to a house of worship, whether by force, threat, or physical obstruction.

4. Disrupting a house of worship is a class B misdemeanor. Any second offense is a class A misdemeanor. Any third or subsequent offense is a class D felony.